**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ERIC SHAPIRO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALLIANCE MMA, INC., PAUL K. DANNER, III, and JOHN PRICE,<br><br>Defendants. | Case No.: 1:17-cv-02583-RBK-AMD<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Daniel Ciccarelli, Michael Desantis, Michael Malcolm, Thomas Bendheim and Anthony Shenk ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alliance MMA, Inc. ("Alliance" or the "Company"), and information readily obtainable on the internet. Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than defendants who purchased or otherwise acquired the common stock of Alliance in the Company's Initial Public Offering ("IPO"), completed on October 6, 2016, or purchased Alliance stock thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement and Prospectus (together, the "Offering Documents") issued in connection with the IPO during the period from October 6, 2016 to April 12, 2017 (the "Class Period").[1] This Complaint seeks to recover damages to Class members caused by defendants' violations of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act").

2. Defendant Network 1 Financial Securities, Inc. ("Network 1") served as the underwriter for Alliance's IPO and sold approximately 2.2 million shares of Alliance common stock, allowing Alliance to raise a total of $10,000,373 from the IPO.

3. The Offering Documents contained Alliance's financial results for 2014, 2015 and for the three and six months ended June 30, 2016.

4. Unbeknownst to investors, the Offering Documents were false and misleading because they failed to account for, and recognize as expense, $2.595 million in stock-based compensation.

5. On April 12, 2017, Alliance filed a Form 8-K with the SEC stating, among other things, that due to its failure to properly account for the $2.595 million of stock-based compensation, the Company's previously-issued financial statements for the three and six

[1] The Offering Documents are incorporated herein by reference.

months ended June 30, 2016 contained errors and should no longer be relied upon. Alliance further announced in the same 8-K that it would restate the erroneous financials on its 2016 Form 10-K.

6. On April 17, 2017, Alliance filed its 2016 10-K with the SEC, which included the restated financials.

7. The failure to account for and expense the $2.595 million in stock-based compensation impacted several key figures in the financial results reported in the Offering Documents, rendering them highly false and misleading to investors. For example:

a. For the three months ended June 30, 2016, the Offering Documents only reported $27,254 in General and Administrative Expenses. The Restatement showed that General and Administrative Expenses were actually $2,662,254, or more than ***ninety-seven times*** what was originally reported.

b. For the three months ended June 30, 2016, the Offering Documents only reported a Net Loss of $107,254. The Restatement showed that Net Loss was actually $2,702,254, or more than ***twenty-five times*** what was originally reported.

c. For the six months ended June 30, 2016, the Offering Documents only reported $41,530 in General and Administrative Expenses. The Restatement showed that General and Administrative Expenses were actually $2,636,530, or more than ***six-three times*** what was originally reported.

d. For the six months ended June 30, 2016, the Offering Documents only reported a Net Loss of $223,941. The Restatement showed that Net Loss was actually $2,818,941, or more than ***twelve times*** what was originally reported.

8. Because the Offering Documents vastly understated Alliance's Net Loss and Expenses, the Offering Documents had the effect of artificially inflating the price of Alliance common stock in the IPO and aftermarket.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k, 771(a)(2) and 77o).

10. This Court has jurisdiction over this action pursuant to §22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

11. Venue is properly laid in this District pursuant to §22 of the Securities Act, 15 U.S.C. §77v and 28 U.S.C. §1391(b).

12. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13. Lead Plaintiff Thomas Bendheim purchased Alliance common stock directly from and through Network 1 in the IPO.

14. Lead Plaintiff Anthony Shenk purchase Alliance common stock directly from and through Network 1 in the IPO.

15. Lead Plaintiff Daniel Ciccarelli purchased Alliance common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO.

16. Lead Plaintiff Michael Desantis purchased Alliance common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO.

17. Lead Plaintiff Michael Malcolm purchased Alliance common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO.

18. Each of the Lead Plaintiffs' certifications pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") listing their Alliance stock transactions have been previously filed with this Court and are incorporated by reference herein.

19. Lead Plaintiff Bendheim and Shenk's Subscription Agreements to purchase Alliance stock in the IPO have been previously filed with this Court and are incorporated by reference herein.

20. Plaintiffs all purchased Alliance common stock traceable to the IPO Offering Documents during the Class Period. Plaintiffs' shares are traceable to the Offering Documents because on the dates when Plaintiffs purchased their Alliance common stock, the IPO was the only offering conducted by Alliance.

21. Defendant Alliance focuses on mixed martial arts (MMA) promotional activities. Alliance is a Delaware corporation headquartered in New York, New York. Alliance securities trade on the NASDAQ Stock Market ("NASDAQ") under the ticker "AMMA."

22. Defendant Paul K. Danner, III ("Danner") has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors since May 1, 2016. Danner signed the Registration Statement issued in connection with the IPO.

23. Defendant John Price ("Price") has been the Company's Chief Financial Officer ("CFO") since August 3, 2016. Price signed the Registration Statement issued in connection with the IPO.

24. Defendants Danner and Price are referred to here, collectively, as the "Individual Defendants."

25. Defendant Network 1 is an investment banking firm headquartered in Red Bank, New Jersey. It was the sole underwriter for Alliance's IPO. Network 1 assisted in the preparation and dissemination of the Offering Documents. As the underwriter of the IPO, Network 1 was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.

26. Alliance, the Individual Defendants, and Network 1 are collectively referred to herein as "Defendants."

## DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS

### *Alliance's Inaccurate Offering Documents*

27. On August 16, 2016, Alliance filed a registration statement on Form S-1 with the SEC. The registration statement was subsequently amended, with the final amended registration statement on Form S-1/A filed on August 30, 2016 (collectively, the "Registration Statement").

28. The Registration Statement was declared effected by the SEC on September 2, 2016.

29. The Registration Statement contained a preliminary prospectus. The final prospectus was filed on September 2, 2016 ("Prospectus").

30. The IPO closed on October 6, 2016.

31. In the IPO, Network 1 sold 2,222,308 shares of Alliance common stock at $4.50 per share. Total proceeds from the IPO were $10,000,373. Network 1 received approximately $755,584 as commission for selling Alliance stock in the IPO.

32. Network 1 distributed the Offering Documents to solicit and persuade investors to purchase Alliance common stock in the IPO. The Offering Documents were the main

instruments that Network 1 used to convince Class members to purchase Alliance common stock in the IPO.

33. The Offering Documents contained Alliance's audited financial statements for 2014 and 2015, as well as unaudited financial statements for the three and six months ended June 30, 2016, beginning on page F-16 of the Registration Statement.

34. The Offering Documents contained a condensed Statement of Operations that reported the following financial results for the three months and six months ended June 30, 2016:

**Three months ended June 30, 2016:**

| | |
|---|---|
| General and Administrative Expenses | $27,254 |
| Total Operating Expenses | $107,254 |
| Net Loss | ($107,254) |

**Six months ended June 30, 2016:**

| | |
|---|---|
| General and Administrative Expenses | $41,530 |
| Total Operating Expenses | $223,941 |
| Net Loss | ($223,941) |

35. On April 12, 2017, Alliance filed a Form 8-K with the SEC revealing, among other things, that its previously-issued financial results for the three and six months ended June 30, 2016 contained errors and should no longer be relied upon and must be restated.[2]

36. Alliance's restatement of the financial results for the three and six months ended June 30, 2016 included in the Offering Documents was necessary in order to properly account for and recognize as expense $2.595 million in stock-based compensation, issued on June 16, 2016, that was omitted from the previously-issued financials.

[2] The April 12, 2017 Form 8-K is incorporated herein by reference.

37. On April 17, 2017, Alliance filed its Form 10-K for 2016 ("2016 10-K"), which included the restated financials for the three and six months ended June 30, 2016 (the "Restatement").[3]

38. The Restatement restated the previously-issued financial results for the three and six months ended June 30, 2016 as follows:

**Three Months Ended June 30, 2016**

| | Reported | Restated | Amount Understated | % Understated |
|---|---|---|---|---|
| General and Administrative Expenses | $27,254 | $2,662,254 | $2,595,000 | 97.4% |
| Total Operating Expenses | $107,254 | $2,702,254 | $2,595,000 | 96.0% |
| Net Loss | $107,254 | $2,702,254 | $2,595,000 | 96.0% |

**Six Months Ended June 30, 2016**

| | Reported | Restated | Amount Understated | % Understated |
|---|---|---|---|---|
| General and Administrative Expenses | $41,530 | $2,636,530 | $2,595,000 | 98.4% |
| Total Operating Expenses | $223,941 | $2,818,941 | $2,595,000 | 92.0% |
| Net Loss | $223,941 | $2,818,941 | $2,595,000 | 92.0% |

39. Alliance's financial statements in the Offering Documents contained false and misleading statements of material fact in that they materially understated expense and understated net loss.

40. Defendants should have recognized the substantial and overt misstatements in Alliance's State of Operations for the three and six months ended June 30, 2016 before publishing them in the Offering Documents. Defendants were negligent in allowing these materially incorrect figures to be included in Offering Documents and distributed to investors.

[3] The 2016 10-K is incorporated herein by reference.

***<u>Alliance's Financial Statements Were Not Prepared In Accordance with GAAP</u>***

41. GAAP constitutes the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

42. GAAP is the common set of accounting principles, standards, and procedures that public companies trading in the United States use to compile their financial statements.

43. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). A Statement of Financial Accounting Standards ("FAS") is a formal document issued by the FASB which details accounting standards and guidance of the FASB's accounting policies. A FAS is issued with the expectation that companies listed on a stock exchange in the United States will adhere to it.

44. Management retains responsibility for preparing financial statements that conform with GAAP. The Public Company Accounting Oversight Board ("PCAOB"), an entity created by the Sarbanes-Oxley Act of 2012 to oversee the audit of public companies, states that:

> The financial statements are management's responsibility. … The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. … Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.
>
> PCAOB Auditing Standard (AU) 110.03

45. The Offering Documents falsely stated that Alliance's financial statements contained therein complied with GAAP.

46. SEC and NASDAQ rules and regulations require that financial statements included in a registration statement or prospectus must comply with GAAP. *See* Regulation S-X.

47. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

48. Under GAAP "restatements" are required for material accounting errors that existed at the time financial statements were prepared. *See* SFAS 154; FASB Accounting Standards Codification ("ASC") 250.

49. An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP. SFAS 154; ASC 250.

50. Errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared. FAS 154, ASC 250.

51. Restatements are required for material accounting errors that existed at the time financial statements were prepared. *See* FAS 154.

52. Alliance conceded in its April 12, 2017 8-K that the financial statements contained an error causing it to restate the financial statements.

53. A restatement is a *prima facie* showing that the financial statements were false.

54. The need to restate Alliance's financials for the three and six months ended June 30, 2016 is an admission that those financials did not comply with GAAP and were therefore false and misleading.

***<u>GAAP Requires Stock-Based Compensation to be Recognized as an Expense</u>***

55. Up until 2005, GAAP permitted companies to issue stock-based compensation to its employees and not recognize it as an expense.

56. Companies and their top management favored the old policy because it allowed companies to pay employees in stock and not recognize it as an expense, in other words, companies could pay employees with stock and not have the compensation show up in their financial statements as an expense. This allowed companies to show an artificially higher profit margin in their books.

57. The FASB wanted to change this rule and treat stock-based compensation as an expense, but companies fought against this proposal and lobbied Congress to block the proposed change.

58. Ultimately, in 2005, at the insistence of the SEC, the FASB modified FAS 123 to require companies to treat stock-based compensation as an expense.

59. Since 2005, all public companies, in order to comply with GAAP, are required to treat stock-based compensation paid to employees, officers, directors and consultants as an expense.

**THE UNDERWRITERS ARE LIABLE**

60. Section 11 of the Securities Act provides that underwriters are liable for any false statements of material fact or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

61. Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable. 15 U.S.C. § 77*l*(a)(2).

62. Network 1, as the underwriters for the IPO, offered or sold Alliance common stock. The Offering Documents stated that Alliance engaged Network 1 to be the underwriter for

the IPO. Network 1 received compensation for acting as underwriter and offering, soliciting buyers for, and selling Alliance stock in the IPO.

63. It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement.[4] Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering."[5]

64. As gatekeepers, underwriters must *independently* verify all material facts in offering documents. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

65. Both Section 11 and Section 12 of the Securities Act provide that underwriters are liable for damages resulting from materially false misstatements contained in the offering documents.

66. The amount and nature of an issuer's expenses, and the issuer's net profit or loss, are all material facts requiring inquiry and independent verification by underwriters.

67. Network 1 was negligent or willfully blind in undertaking their duty to perform a reasonable due diligence investigation in acting as underwriters for Alliance's IPO.

68. Network 1's due diligence investigation of Alliance, if in fact any actual due diligence was performed, failed to uncover that Network 1 shortly before the IPO had issued $2.595 million of its stock as compensation to employees, and that this was not reflected in the

---

[4]Goldman Sachs, Report of the Business Standards Committee, January 2011, at 13. Available at <http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf> (last viewed August 13, 2015).
[5]*Id.*

financial statements for the relevant time periods. A reasonable due diligence investigation would have uncovered these very important facts.

69. As a result of Network 1's not performing a reasonable due diligence investigation and/or not performing any due diligence investigation, the Offering Documents misrepresented material information and omitted material information so that the Offering Documents were misleading.

70. It is absolutely well understood in the investment banking industry and in the financial community generally, and confirmed in numerous court opinions, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

71. It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Offering Documents for Alliance's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

72. In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control what information is in offering documents and it controls the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, investment bank, Goldman Sachs, published the *Report of the Business Standards Committee* dated January 2011, describing its role as an underwriter by stating: it "prepares the disclosure" in a prospectus, and will "conduct appropriate and thorough due diligence on the issuer" and will "endeavor to ensure there is no material

misstatement/omission in the disclosure." Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter firm is expected to assist the issuer in providing a Prospectus to investors that discloses all material information that is relevant to the offering." *Report of the Business Standards Committee* at 14.

73. Alliance's IPO was an offering of securities to investors. Network 1 sponsored the IPO, solicited the purchasers, distributed the Prospectus, and acted as an underwriter in the IPO. It was not a private placement.

74. The SEC has observed that in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as Network 1, have ultimate control over the contents and dissemination of the disclosure document, i.e. the Offering Documents. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. Network 1 had this role and duty in underwriting Alliance common stock in the IPO.

75. The above quoted statement by the SEC was also referred to in U.S. District Judge Denise Cote's important decision, *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) - which in effect included a treatise on the history and importance of due diligence in selling securities to investors. Indeed, without an investment bank having performed

a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Offering Documents.

76. Although the term "due diligence" does not appear in any statute or rule, it is well accepted and understood in the investment banking and financial communities that a reasonable due diligence investigation refers to an affirmative duty to verify the accuracy of disclosure concerning securities offerings and that it is expected that a thorough investigation will take place as part of virtually every issuance of securities.

77. The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditors opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

78. While the due diligence responsibility is not just that of investment banks, securities regulations and industry practice make it the primary responsibility of investment banks. To quote Judge Cote's opinion in *In re WorldCom*, "[N]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter … Underwriters function as 'the first line of defense' with respect to material misrepresentations." 346 F. Supp. 2d at 662. Also, as stated previously, the SEC has stated that: "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering." *Id.* at 662.

79. Network 1 did not conduct a reasonable due diligence investigation in regard to Alliance's IPO.

80. The Offering Documents understated expenses and net loss by more than 90%.

81. Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor - separately, and not together, or in addition to being together. All areas of concern that an auditor may have about the company and/or its accounting decisions should be discussed - with follow-up questioning if deemed necessary.

82. For Network 1 to fail to question Alliance about stock-based compensation is a due diligence failure of great magnitude.

83. The proof of how unreasonable or reckless the due diligence investigation of Alliance was will be confirmed after discovery has been completed in this matter. Among other things, it will be confirmed whether or not Network 1 has a detailed due diligence memorandum in its file, outlining precisely what it did in terms of due diligence. It is standard procedure in the investment banking industry to have a detailed due diligence memorandum in the files.

84. Network 1 failed to conduct proper due diligence. If it had, it would have discovered that Alliance failed to recognize as expense $2.595 million in stock-based compensation, and consequently, the Offering Documents contained false financial results.

## CLASS ACTION ALLEGATIONS

85. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Alliance common stock in its IPO, which closed on October 6, 2016, or purchased Alliance stock thereafter in the stock market pursuant and/or

traceable to the Company's Registration Statement and Prospectus issued in connection with the IPO during the period from October 6, 2016 to April 12, 2017, and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

86. The members of the Class are so numerous that joinder of all members is impracticable. Over 2.2 million shares were sold in the IPO. Since the IPO, the Company's common stock has actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alliance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

89. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

90. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether the Securities Act was violated by Defendants as alleged herein;

b. whether the Offering Documents were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

c. the extent to which members of the Class have sustained damages and the proper measure of damages

91. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 11 of the Securities Act**
**Against All Defendants**

92. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This claim is not based on and does not sound in fraud.

93. This claim is brought by Plaintiff and on behalf of other members of the Class who purchased or otherwise acquired Alliance common stock pursuant to or traceable to the Company's IPO. Each member of the Class acquired his, her, or its shares pursuant to and/or

traceable to, and in reliance on, the Offering Documents. Alliance is the issuer of the securities through the Offering Documents, on which the Individual Defendants were signatories.

94. Defendants issued and disseminated, and caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts as set forth above. By reason of the conduct alleged herein, each Defendants violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. §77k.

95. Alliance is the issuer of the securities sold via the Offering Documents. As issuer of these securities, the Company is strictly liable to Plaintiffs and the Class members for the material misstatements and omissions contained therein.

96. At the times they obtained their shares of the Company, Plaintiffs and the members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

97. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering Documents that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering Documents. It is therefore timely.

98. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Alliance common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.

99. By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the Defendants and each of them, jointly and severally.

**COUNT II**

**Violations of Section 12(a)(2) of the Securities Act Against Network 1**

100. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is not based on and does not sound in fraud.

101. Plaintiffs Shenk and Bendheim purchased Alliance common stock directly from Network 1 in the IPO.

102. Network 1 was the seller, offeror and/or solicitor of sales of the shares offered pursuant to the Offering Documents. The Offering Documents contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

103. Plaintiffs and the other Class members who purchased or otherwise acquired shares pursuant to the materially untrue and misleading Offering Documents did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

104. This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after Alliance shares was sold to the Class in connection with the Offering.

105. Network 1 owed to Plaintiffs and the other Class members who purchased or otherwise acquired shares pursuant to the materially false and misleading Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the

Offering Documents, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. Network 1 did not undertake a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading. By virtue of the conduct alleged herein, Network 1 violated § 12(a)(2) of the Securities Act.

**COUNT III**

**Violations of Section 15 of the Securities Act Against**
**Danner and Price**

106. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

107. This claim is asserted against Danner and Price, each of whom was a control person of the Company at relevant times.

108. Danner and Price were control persons of the Company by virtue of, inter alia, their positions as senior officers and/or directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Offering Documents.

109. Neither Danner nor Price made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

110. This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after Alliance shares were sold to the Class in connection with the IPO. It is therefore timely.

111. By reason of the above conduct, for which the Company's is primarily liable, as set forth above, Danner and Price are jointly and severally liable with and to the same extent as Alliance pursuant to Section 15 of the Securities Action, 15 U.S.C. 77o.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of herself and the Class, prays for judgment and relief as follows:

a. declaring this action to be a proper class action, and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

b. awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

c. awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action; and

d. awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: January 16, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January 2018 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Laurence M. Rosen*